IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 7, 2011 Session

**MARY LEE MARTIN, v. S. DALE COPELAND**

**Appeal from the Chancery Court for Hamilton County**
**No. 03-0710    Hon. Jeffrey M. Atherton, Chancellor**

**No. E2010-02639-COA-R3-CV-FILED-JANUARY 30, 2012**

In this boundary line dispute, plaintiff sued defendant, the adjoining property owner, and defendant countersued.  Each of the parties employed their own surveyors who testified at the trial, and the Trial Court ultimately established a boundary line between the parties. Defendant appealed to this Court.  We affirm the Judgment of the Trial Court.

**Tenn.  R. App. P.3 Appeal as of Right; Judgment of the Chancery Court Affirmed.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, J., joined.

Glenn R. Copeland, Chattanooga,  Tennessee, for the appellant, S. Dale Copeland.

Arnold A. Stulce, Jr., Chattanooga, Tennessee, for the appellee, Mary Lee Martin.

**OPINION**

Plaintiff  Martin filed a Petition to Quiet Title and To Establish Boundary Line, naming her neighbor Copeland as defendant.  She averred they had a boundary line dispute, and both of their deeds referred to a common boundary as being defined by a Boundary Line Agreement between Massey and Cross dated June 1962.  She averred the parties had conflicting surveys and were unable to determine the boundary line established by the Boundary Line Agreement.  She stated that she had made improvements on the disputed strip of property, but that most of it was wooded and overgrown.  Further that the dispute was

triggered when she began cutting trees and growth on the disputed property, and in the alternative, she claimed she was entitled to the property by adverse possession.

Copeland filed an Answer and Counter-Complaint, asserting the boundary in dispute had been established since it was surveyed and marked in 1962, and was referred to in both parties' deeds. He averred that he was damaged by the plaintiff cutting trees on his property, and asked the Court to require plaintiff to remove the pool house and any other encroaching structures, and for attorneys fees.

At trial, Martin testified that she bought her property in 1999, and her property had a house on nearly two acres, with a swimming pool and pool house. She testified that the pool and pool house were there when she bought the property, and that the disputed property was behind her pool house.

She testified that a few years ago, she was having some tree work done because they were hanging over her pool, and Copeland approached her at the end of the second day they were cutting trees and told her she was cutting his trees. She testified that she was relying on a survey she was provided when she closed on the house and was unaware of any issue about the boundary line.

She testified that this was the only time that Copeland had complained to her about the property line. She testified that both of them went and got their surveys, and compared them and discovered they were different. She testified that she showed Copeland the existing flags and pin, but he told her that those marked the old line and that it had been moved.

She testified that she stopped work and both parties had their property surveyed. She testified that she learned that the survey she was given at the time she purchased the property was only a "mortgage survey", but that the surveyor told her he did it from established points, like iron pins. She testified that she hired Niles Surveying to do a survey, and Niles set flags, and she saw Copeland remove one of Niles' flags and throw it. She testified that her deed referenced the agreed line established by the boundary agreement between Massey and Cross, and that both Niles and Hopkins placed pins when they surveyed. She testified that all the deeds in her chain of title used the same legal description.

Charles Crattie was the next witness, and he testified that he was a land surveyor, and that he surveyed the disputed property in 2001 for Niles Surveying. He testified that he researched all the deeds, and saw that the deeds referenced the boundary line agreement from 1962 and the Espy drawing. He testified that in doing his survey, he utilized the Espy drawing, as well as the Betts Survey and the Kesler Subdivision Plat.

He testified that he gave a lot of weight to the boundary line agreement and its attached drawing by Espy, because that was the line the parties intended to establish. He testified that when they tried to place the agreed line on the ground, nothing matched up, and that he then had to look at what the agreement sought to accomplish, so he started with the Betts survey, which all of the deeds referenced. He explained that there were some problems with the calls in the deeds, and that Martin's deed was written in such a way that he had to survey the properties adjoining it and then give Martin the "remainder". He testified that there was no dispute about the eastern line, and if you matched them up based on that, Hopkins' survey was much different than Betts'. He explained the monuments he found which supported his survey, all of which were noted on his survey. He concluded that it was very difficult to say where the agreed line was, because of problems with the Espy survey.

The parties submitted the deposition of Don Reed, who testified that he used to own the Martin property, having bought it in 1971 from the Masseys. He testified that Mr. Massey himself showed him where the property lines were, and that he sold the property to the Farrs in 1998, and they later sold it to Martin. He testified that he built the existing house within a year or so of buying the property, and later added the pool and pool house. He testified that he built the pool in the late 80's, and built the pool house 2-3 years later, and that Dale Copeland approached him at some point and told him the pool house was partially on his property. He told Copeland he disagreed, and showed him where the line was. The dispute died down, and Reed testified that Dale Copeland's father told him he didn't own what he thought he owned because the deed wasn't right.

Glenn Copeland was the next witness, and he testified that he was a practicing attorney, and was Dale Copeland's father, and that he bought his property in 1972, and later acquired the property now belonging to Dale in 1977, which he had quitclaimed to Dale. Copeland testified that Massey and Walters moved the property line by agreement so that it didn't intersect the house, as shown on an exhibit. He testified that he had the Walters' house moved so he could put in a new driveway. Dale Copeland testified that he owned the property which he obtained from his father, and that he objected to Martin cutting trees, and showed her his survey, but did not remember seeing hers.

David Hopkins was the next witness, and he testified that sometimes monuments are lost over time. He admitted that different surveyors often have different opinions. He admitted that this survey went through several revisions because they were trying to satisfy themselves that they had placed the line as close to the intended line as possible. He stated that they had the Espy drawing, as well as the Betts survey, but they didn't use the Betts survey because they could not find the pin Betts had relied on. Hopkins testified they tried to fit all the pieces together, and said they found some pins that did not fit with the calls/lines, so they decided to project a parallel line across from the southern line of Kesler Hills to

establish the agreed line. He explained that if they didn't do it this way, they would create a "gore" or a triangle of property which would revert to Massey. Hopkins said that Crattie found a corner pin between the Partons and Copeland that they did not find, and this was part of the reason their surveys were different. Hopkins admitted that Crattie's survey was more consistent with the Espy and Betts' surveys than his, but that he thought Crattie had "looseness" on his southeast corner.

Following the trial, the parties filed a Stipulation which stated the survey by Hopkins showed 3 iron pins set by Hopkins along the line he surveyed. A copy of the survey map was attached. Plaintiff then filed an Objection to Proposed Final Order, stating that, in its Memorandum Opinion, the Trial Court found that Hopkins found the three pins along the line Hopkins surveyed, when Hopkins actually set them. Thus, plaintiff asserted that the Court's findings did not comport with the evidence. Defendant filed a Response, conceding that Hopkins did set pins along the line he found, but that it was still the correct line.

The Court then entered an Order, stating that its findings did not correspond with the parties' stipulation, and concluded that this flaw in the presentation of exhibits resulted in a misunderstanding of the evidence, and thus deemed it appropriate to grant a new trial.

At the second trial, Martin's testimony was consistent with her testimony from the first trial. Crattie was the next witness, and his testimony was consistent with his testimony at the first trial.

Walter Martin also testified, and essentially reiterated his former testimony.

Dale Copeland testified consistently with his testimony from the first trial, except that he admitted that he removed a stake placed by Crattie because it was "way off".

Hopkins was the next witness, and he explained his survey process the same as at the former trial. He agreed that the Espy survey was probably not done on the ground. He also agreed that his survey did not match that of Betts.

Glenn Copeland was the last witness to testify, and his testimony matched that of the last trial.

The Court then issued its opinion, stating that it was impossible to establish the boundary line based on the exhibit, and that if you began at the west baseline, as Hopkins did, you would get one line, but if you started at the East baseline, as Crattie did, you would get a different line. The Court found that it was proper to use the Betts survey and thus established the line at an iron pin found by Hopkins and Crattie on the east side, and

extended it to a pin found on the west side by Hopkins. The Court thereby established this as the boundary line between the parties.

Defendant has appealed, and raises these issues:

1.      Whether the Trial Court erred in ordering a new trial because the pins along the line found by Hopkins were set by him rather than being found by him?

2.      Whether the Trial Court erred in the second trial by ignoring that the agreed line was straight and 1361.2 feet long, separating the two original tracts belonging to Massey and Cross?

3.      Whether the Trial Court erred in changing the base bearing and angle of the agreed line?

4.      Whether the Trial Court erred in announcing, before he heard all of the testimony, that he had already decided the case?

Appellant argues that the Trial Court erred in ordering a new trial because the pins along the line were set rather than found by Hopkins. Further, that the line found by Hopkins was correct, regardless of this fact, and also that the line should be found to be where Hopkins located it based on the rock placed there by Copeland and Reed.

At the conclusion of the first trial, the Court expressly stated that Hopkins' line matched these pins that had "been there for years", and that if the pins had been placed there by Hopkins, that would be entirely different. The Court misapprehended the evidence, since the evidence clearly showed that Hopkins did set these pins which the Court relied upon, and they had not "been there for years",which the parties conceded in their Stipulation (and the Trial Court later acknowledged when granting a new trial) .

As stated in Tenn. R. Civ. P. 59.05, the court may, on its own initiative, grant a new trial "for any reason for which it might have granted a new trial on motion of a party where no such motion has been filed." The court must simply "specify in its order the grounds for its action." *Id*. In this case, the Trial Court stated that it misunderstood the evidence regarding Hopkins' survey and the fact that Hopkins set these pins, and the Court explained that it was unable to properly see the witnesses and exhibits during trial, resulting in a misapprehension of the testimony. For these reasons, the Trial Court properly granted a new trial.

Next, appellant argues the Trial Court should have just relied on the line as found by

Hopkins because Hopkins' survey was correct, and because Copeland testified that he and Reed placed a rock there to mark the boundary line many years ago. The Trial Court was not convinced that Hopkins' survey was correct after learning that the pins along the line found by Hopkins were placed there by Hopkins, and thus felt a new trial was warranted. Further, the testimony about the rock placed at the boundary line came solely from Dale Copeland, and was disputed by Martin at the first trial, when she testified that there was no rock or other marker found at the line claimed by Copeland.

Next, Copeland argues that the Trial Court erred in finding the position of the parties' boundary line where it did, in that it should be a straight line that crosses the road, and has a different angle/bearing than the agreed line. As this Court has previously stated:

> The usual standard of review applicable to bench trials applies in boundary disputes. This Court conducts a de novo review of the trial court's decision with a presumption of correctness as to the trial court's findings of fact, unless the evidence preponderates against those findings. For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect.
>
> "In resolving a boundary line dispute, it is the role of the trier of fact to evaluate all the evidence and assess the credibility of the witnesses." "Where there is a conflict in testimony, the trial court is in a better position than this Court to observe the demeanor of the witnesses and evaluate their credibility." Thus, we will give great weight to a trial court's determinations as to the credibility of witnesses. This deferential standard specifically applies in a boundary dispute where a trial court must choose between two competing surveys.

*Dillehay v. Gibbs*, 2011 WL 2448253 (Tenn. Ct. App. June 16, 2011)(citations omitted).

In this case, the Court had the benefit of the witnesses and the surveys regarding the proper placement of the boundary lines, along with numerous exhibits, and then determined that the point on the east side found by Crattie was most accurate (which was marked with a pre-existing pin), and connected it with an existing pin found on the west side to place the boundary between these parties. The Court's findings are based on the evidence that was presented. The Court noted that if one started on the east baseline, one boundary line was found, and if one started on the west baseline, a different boundary line was found, and the Court determined that it was more appropriate to start on the east baseline in accordance with the Betts survey, which everyone agreed was accurate. Essentially, the Court's determination "split" the disputed property between the plaintiff and defendant, and placed plaintiff's pool house within her property lines.

As was stated in *Dillehay*:

The evidence on either side was problematic and not particularly compelling. All three surveyors were reluctant to establish an exact boundary line and noted the inherent difficulties in doing so based on boundary deeds. Mr. Holland used the old Boze and Richardson deeds to draw a line. However, Mr. Holland refused to call his line the boundary line. Moreover, he never shot his line from the ground, and his straight, compass-point lines do not appear to match the contours of the properties. Mr. Puckett, although his line more closely followed the natural contours of the land, testified that he did not survey the line himself but rather prepared a trial exhibit showing where everyone else had purported the line to be. Mr. Carman's line appears to be based largely on the location of the barbed-wire fence.

\* \* \*

From our review of the record, the trial court was intensely engaged in trying this matter. It thoroughly questioned the surveyors' methods and conclusions. It ultimately concluded that Mr. Carman's survey was the most reliable and established the boundary line accordingly. We will give great deference to a trial court's decision between competing surveys. Based on our review, we cannot say that the trial court's findings of fact preponderate against the record. Rather, ample evidence in the record supports the trial court's finding that the barbed-wire fence was historically considered the boundary between the two farms.

*Id.* at \*7.

In this case, the evidence was less than a model of clarity regarding the deeds and the competing surveys. Martin's deed does not contain distances, which both surveyors conceded complicated the ability to survey her property. Adding to the confusion, both surveyors recognized that the Espy survey, which is attached to the boundary line agreement from 1962, was likely never run on the ground. Both surveyors admitted that the placement of this line was difficult at best and that different surveyors would likely have different opinions. Based on the evidence presented to the Court, the Court placed the boundary in the location it thought best in accordance with the Betts survey and the survey by Crattie, and the evidence does not preponderate against the Court's finding. Tenn. R. App. P. 13(d).

Appellant argues the Court erred because the agreed line was stated to go straight across Jennifer Lane and originally separated two large tracts of property which lay on both sides of the road. The evidence demonstrated, however, that the Espy drawing was not "run on the ground" and thus the boundary line agreement was based on what both surveyors

-7-

called a "paper survey". The Trial Court fashioned a boundary that was supported by the evidence and considered the equities on both sides. As this Court has previously stated, "[w]hen determining a boundary line that is in dispute, the court must look first to the natural objects or landmarks on the property, then to the artificial objects or landmarks on the property, then to the boundary lines of adjacent pieces of property, and finally to courses and distances contained in documents relevant to the disputed property." *Dillehay v. Gibbs*, 2011 WL 2448253 (Tenn. Ct. App. June 16, 2011). Thus, the courses and distances are not as important as landmarks and boundary lines of adjacent property. The Trial Court placed the line in the most appropriate and equitable location based on all of the evidence presented, including the evidence of long-existing pins/monuments, and we affirm the Trial Court's findings and Judgment.

Finally, Copeland argues that the Trial Court erred by announcing, before it heard all of the evidence, that it had decided the case. What Copeland referred to is that the Trial Court stated, before the final witness (Glenn Copeland) took the stand, that it had decided the case based on the testimony and evidence provided by the surveyors. The Court permitted Copeland's testimony to go forward, however, and listened to it before rendering its decision. Copeland is not an expert witness, and did not add new evidence to the testimony that had already been presented. The Trial Court did not err in pronouncing its judgment based on the evidence provided by the surveyors, when the Court considered all of the evidence presented. This issue is without merit.

We affirm the Judgment of the Trial Court and remand, with the cost of the appeal assessed to S. Dale Copeland.

_____
HERSCHEL PICKENS FRANKS, P.J.